**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAILROAD CONSTRUCTION COMPANY OF SOUTH JERSEY, INC., | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 08-377 |
| v. | : | **OPINION** |
| JP RAIL, INC., | : | |
| Defendant. | : | |

**RODRIGUEZ**, Senior District Judge

This matter comes before the Court on several motions filed by both parties. Defendant JP Rail, d/b/a Southern Railroad Company of New Jersey ("JP Rail" or "JP") moves for partial summary judgment, arguing that certain of Plaintiff's claims are barred by the statute of limitations. Plaintiff Railroad Construction Company of South Jersey, Inc. ("RCC") moves for summary judgment as to all claims against Defendant. RCC has also filed a cross-motion for summary judgment in response to the motion of JP Rail. In addition, RCC has filed a motion to strike Defendant's Answer and for default judgment. The Court has considered the written submissions of the parties. For the reasons stated below, JP Rail's motion for partial summary judgment will be granted in part and denied in part; RCC's motions for summary judgment and motion to strike will be denied.

## Background

This case arises out of a business relationship between the parties which lasted over twelve years. RCC specializes in construction and related services relating to

railroad tracks and bridges and serves governmental agencies, railroads, and other companies. Beginning in or around 1994, JP Rail began contracting with RCC for construction services on two rail lines which JP Rail operated in South Jersey at that time. JP operated the Salem Line, running from Swedesboro to Salem, under an operating license and lease from Salem County; JP owned and operated the Pleasantville Line, which runs from Winslow Junction to Pleasantville. RCC provided various construction and repair services on the lines until its relationship with JP Rail ended in 2006. Joseph Petaccio, the former president of JP Rail, and Thomas Collard, the former vice-president, generally made work requests on behalf of JP Rail to RCC.[1] RCC provided its services on both a fixed price and a time and materials basis and sent invoices for completed jobs on a regular basis.

RCC alleges that JP Rail has failed to make all payments due for work performed by RCC. Specifically, RCC brings this cause of action with respect to specified invoices from a period of 1998 to 2006, attached to Plaintiff's Complaint as "Exhibit A" (the "Exhibit A invoices"). RCC alleges that the disputed invoices total $1,013,673.51, excluding accrued interest in the amount of $1,620,360.91. (Aff. of James Daloisio ¶ 29, Jul. 21, 2011.) These invoices reflect track work, repairs and construction related services which RCC performed on the Salem and Pleasantville Lines, including repair work completed following Hurricane Floyd and a construction project for replacement of the Oldman's Creek Bridge trestle in Salem County. RCC did not complete the Oldman's Creek Bridge replacement. Rather, RCC alleges that JP Rail contracted with

---

[1] Mr. Petaccio passed away during the pendency of this litigation.

RCC to complete the job and engaged RCC's performance of preparatory engineering and work on the project before the job was ultimately awarded to another contractor. (Id. at ¶¶ 59-60). According to JP Rail, while JP had contracted with RCC to perform repair work on the bridge, the replacement project was subsequently taken over by Salem County, which requested bids and hired a different contractor without input from JP Rail. (Aff. of Thomas Collard ¶ 10, Sept. 14, 2010.)

During the course of the relationship between the parties, JP Rail encountered cash flow problems which led to delayed payment of RCC invoices. RCC continued to provide construction services despite outstanding invoices based on representations by Mr. Petaccio that the invoices would be paid once funding permitted. (Supp. Aff. of James Daloisio ¶ 26, August 18, 2011.) Most of the work RCC completed for JP Rail was paid for in partial payments sent by JP Rail. (Dep. of James J. Daloisio 88:19-25, 89:1-4, March 16, 2010.) JP Rail often sent checks without a designation as to which invoice the payment applied. In such cases, RCC's practice was to apply the checks against the oldest outstanding invoices. (Id. at 135:7-22.)

RCC sent numerous letters and requests regarding unpaid invoices, including letters specifying invoices in February and March of 2005. (Daloisio Supp. Aff. ¶ 32; Ex. E-I.) On January 17, 2007, James Daloisio, president of RCC, sent a letter to Mr. Petaccio requesting a meeting to discuss unpaid invoices. (Daloisio Supp. Aff. Ex. J.) Mr. Petaccio sent a letter dated January 22, 2007 in which he denied that any invoices remained unpaid. (Daloisio Supp. Aff. Ex. K.) On January 23, 2007, Thomas Collard, who by then was no longer vice-president of JP Rail, sent an email to Mr. Petaccio in which he expressed doubts or uncertainties as to the status of open invoices from RCC,

and suggested that Mr. Petaccio "stall for time" and "cooperate as much as possible to prevent" Daloisio from filing a lawsuit. (Cert. of Rudi Grueneberg Ex. G, July 21, 2011, attached to Plaintiff's Motion for Summary Judgment [67].) Collard expressed doubt as to whether the majority of the invoices actually remained open. Id.

RCC subsequently sent additional letters to JP Rail in 2007 to which JP either did not respond or responded denying that invoices were not paid. JP Rail asserted on numerous occasions that it did not have the invoices in question and requesting that RCC send documentation. (Def.'s Br. [66] Ex. P; Grueneberg Cert. Ex. J.) RCC maintains that this information had been provided to JP Rail in a March 9, 2007 letter, to which JP Rail did not respond. (Daloisio Supp. Aff. ¶ 36.) In correspondence between attorneys for the parties beginning in May of 2007, RCC indicated its intention to file a lawsuit and JP Rail either denied knowledge of outstanding invoices or failed to respond. (Grueneberg Cert. Ex. I-K.) On December 1, 2007, RCC sent JP Rail a letter signed by Mr. Daloisio stating that an audit of RCC's accounts showed a current amount due by JP Rail of $60,978.40.

Plaintiff filed its Complaint on January 18, 2008, alleging breach of contract and related claims. During the course of discovery, JP Rail produced approximately seventy checks, most of which did not indicate an invoice number and did not match specific amounts billed on given invoices. Both parties originally filed motions for summary judgment on August 23, 2010, and Plaintiff filed a cross-motion for summary judgment on October 4, 2010. [Docket Entry ## 42, 43 and 55.] Given the state of the record, the Court held a telephone conference with the parties on February 8, 2011, and all motions were withdrawn without prejudice pursuant to the Court's recommendation that the

4

parties account for all checks and invoices as between the parties in order to reconcile the non-designated checks provided by Defendant. This accounting was represented in "Exhibit 21A-21C" of the Final Pretrial Order, which lists all invoices sent to JP Rail over the course of the relationship ("21A"), all checks JP Rail sent to RCC ("21B"), and a Customer History Report from RCC ("21C"). On July 22, 2011, Defendant filed its present motion for partial summary judgment. [Docket Entry # 66.] On the same day, Plaintiff filed its present motion for summary judgment. [Docket Entry #67.] On August 12, 2011, Plaintiff filed a motion to strike. [Docket Entry # 84.] Plaintiff later filed a cross-motion for partial summary judgment on August 22, 2011, along with its opposition to Defendant's motion for partial summary judgment. [Docket Entry # 88.] The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1337.

## Discussion

### I. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477

5

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

6

is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II. JP Rail's Motion for Partial Summary Judgment

JP Rail moves for partial summary judgment, arguing that many of the invoices which RCC claims are unpaid are beyond the statute of limitations and therefore ought to be dismissed. JP further seeks summary judgment with respect to RCC's claims relating to the replacement of the Oldman's Creek trestle because RCC did not perform the job and JP did not have a contract with RCC for that project. As both parties seek summary judgment with respect to the Oldman's Creek project, the Court will address it separately below. The Court will first consider JP Rail's contention that certain of the claimed invoices are outside of the statute of limitations.

The statute of limitations for contract actions in New Jersey is set out in N.J.S.A. 2A:14-1, which provides in relevant part:

> Every action at law. . . for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued.

N.J.S.A. 2A:14-1. JP Rail contends that because RCC filed its action on January 8, 2008, all claims arising from invoices dated prior to January 8, 2002 are barred by the 6 year statute of limitations. RCC argues that JP Rail is equitably estopped from asserting a statute of limitations defense because JP Rail made representations and promises to pay RCC with the intent to mislead and induce RCC into not filing a lawsuit. Under the

circumstances, RCC argues, the statute of limitations is equitably tolled. The Court does not agree.

Under New Jersey law, equitable tolling of the statute of limitations "may be applied where 'the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" Freeman v. State, 788 A.2d 867, 879 - 880 (N.J. Super. App. Div. 2002) (citation omitted); W.V. Pangborne & Co., Inc. v. New Jersey Dept. of Transp., 562 A.2d 222, 228 (N.J. 1989) ("through the process of negotiating, a defendant can intentionally lull a plaintiff into believing litigation is not necessary; a defendant in those circumstances may not take advantage of the protracted negotiations to have the statute of limitations run against the plaintiff's claim"). New Jersey courts construe the applicability of equitable tolling narrowly, however, and "absent a showing of intentional inducement or trickery by a defendant, the doctrine of equitable tolling should be applied sparingly and only in the rare situation where it is demanded by sound legal principles as well as the interests of justice." Freeman, 788 A.2d at 880 (citation omitted).

RCC asserts that JP Rail, over the course of its relationship with RCC, repeatedly made promises to pay open invoices when JP's cash flow allowed, and that JP "engag[ed] in a strategy designed to mislead and prevent RCC from filing legal action." (RCC Opp. Br. [88] 25.) RCC points to the internal letters between Thomas Collard and Joseph Petaccio in January of 2007, in which Mr. Collard recommends that Mr. Petaccio "stall" RCC with respect to certain invoices as the statute of limitations would soon expire as to certain invoices. RCC also cites correspondence between RCC and JP Rail–both before and after Collard's internal letters–in which RCC asserted that there

were open invoices, and JP Rail either failed to respond or denied knowledge of any invoices that had not been paid. In response, JP Rail concedes, for purposes of its motion for summary judgment only, that Mr. Collard recommended to Mr. Petaccio that he stall RCC with respect to the invoices. JP Rail argues, however, that the evidence demonstrates that it did not follow Mr. Collard's suggestion.

James Daloisio sent a letter to Mr. Petaccio on January 17, 2007, requesting a meeting to discuss past due invoices. In Mr. Petaccio's January 22, 2007, response, he claimed he knew of no past due invoices and "assure[d]" Daloisio that anything owed would be paid. (Daloisio Supp. Aff. Ex. K.) Mr. Petaccio also referenced a previous occasion in which RCC made an "incorrect" claim that JP Rail was in possession of money from the State that belonged to RCC. (Id.) Mr. Petaccio concluded the letter by stating that his manager had been attempting to get into contact with RCC regarding "serious workmanship problems" on past jobs completed by RCC. (Id.) Then, on January 23, 2007, Mr. Collard emailed Petaccio regarding the invoices RCC claimed were unpaid. In the letter, Collard indicates that his records either showed nothing due for certain invoices or time periods, or that he had no records or recollection as to others. Collard closes the letter by suggesting that Petaccio

> stall for time. In two and a half months it will be too late for him to collect the 2001 invoices. You might stall by asking him to send you backup material. Then pay some of the newer, smaller invoices if they are in fact unpaid. Do it one at a time so he can see some progress . . . cooperate as much as possible to prevent him from filing any legal action to collect until you can research his claims. I really can't imagine these invoices are still open with the possible exception of the work at Alloway due to the BDW car.

(Grueneberg Cert. Ex. G.)

The next documented correspondence between the parties took place on March 9,

2007, when RCC sent a letter to Petaccio regarding open invoices and attaching a statement of the invoices. According to RCC, JP Rail never responded to this letter. In a letter dated March 29, 2007, however, Petaccio asserted that he had "paid all invoices that were either mailed to [him] or forwarded by Tom Collard." (Def.'s Br. [66] Ex. P.) In May of 2007, the exchange of correspondence between Plaintiff's counsel and David DeClement, former vice president and general counsel of JP Rail, took place, wherein Plaintiff's counsel itemized invoices alleged to be outstanding, and DeClement asserted that his client had no knowledge of the charges alleged. Plaintiff's counsel's May 31, 2007 letter concluded by stating that "[a]s a matter of professional courtesy, suit will not be instituted for a period of ten (10) days so that you may have the opportunity to review this matter in detail with your client." (Grueneberg Cert. Ex. K.)  According to Plaintiff, Mr. DeClement did not respond in any form to this letter. Plaintiff again indicated that a suit would be filed in a letter dated June 23, 2007 and inquiring whether DeClement was authorized to accept service of the complaint; Plaintiff states that it did not receive a response. (Supp. Cert. of Rudi Grueneberg Ex. A, Sept. 12, 2011.)

It is undisputed that Thomas Collard suggested a course of action to stall RCC with respect to alleged unpaid invoices on January 23, 2007. Even viewing the facts in a light most favorable to RCC, however, the evidence does not support RCC's contention that it was lulled into sitting on its rights or that JP Rail led RCC to believe that litigation was unnecessary "by representing that [RCC's] claim [would] be amicably settled without the necessity for litigation." W.V. Pangborne & Co., Inc., 562 A.2d at 227. On at least two occasions, Plaintiff's counsel indicated that a law suit would be initiated in letters directed to JP Rail's counsel and JP Rail did not respond. Both before and after

Mr. Collard's suggested course of action, Petaccio denied knowledge of any invoices that had not been paid and expressed doubt as to whether or not money was owed.[2] He also expressed concerns for the quality of RCC's work. It is clear from the nature of the correspondence between the parties that a dispute existed as to whether or not the invoices in question were past due and that JP Rail did not "cooperate as much as possible" as Mr. Collard had suggested. Moreover, according to Mr. Daloisio, in 2006, Mr. Petaccio told Mr. Daloisio's son that RCC would have to sue JP Rail if it sought additional payment for one of the projects cited as due and outstanding. (Daloisio Dep. 94:4-22.)

While Collard's suggesting to stall RCC is troubling, the full record does not demonstrate that RCC reasonably relied on inducements not to sue made by JP Rail. JP Rail's failure to respond to several letters from RCC regarding the unpaid invoices–including warnings of an impending lawsuit--as well as JP's expressed doubt as to whether certain invoices were in fact past due do not amount to representations that the matter would be amicably settled. JP Rail further challenged the quality of RCC's workmanship, and indicated in 2006 that additional funds for one project would not be forthcoming absent a lawsuit. That RCC chose to sit on its rights for several years may speak to its being magnanimous in the face of JP Rail's funding difficulties, but it does not automatically follow that JP Rail tricked or induced RCC into doing so. Accordingly, the Court finds that tolling of the statute of limitations is not appropriate in

---

[2] Given that some of the invoices which form the basis of RCC's claims are dated as early as 1998, a number of the invoices would have been outside the statute of limitations prior to Mr. Collard's January 2007 recommendation.

this case.  The very purpose of statutes of limitations is to encourage the "rapid resolution of disputes, repose for defendants, and avoidance of litigation involving lost or distorted evidence." <u>Miller v. Fortis Benefits Ins. Co.</u>, 475 F.3d 516, 522 ( 3d Cir. 2007). Surely this case, with its prolonged procedural history, poor record of record-keeping, and less than diligent discovery, illustrates the paramount importance of the last of these concerns. Defendant's motion for partial summary judgment as to Plaintiff's claims arising out of invoices dated prior to January 8, 2002 will be granted.

### III. RCC's Motion for Summary Judgment as to the Exhibit A Invoices

Plaintiff moves for summary judgment on all of its claims arising out of the invoices listed in the schedule attached to its Complaint as Exhibit A. RCC argues that JP Rail has not and cannot produce evidence that the invoices in question were paid. Instead, RCC argues, JP Rail has merely provided approximately seventy cancelled checks, the majority of which do not indicate invoice numbers, and baldly asserts its contention is that these checks, totaling over $2.8 million, ought to be applied to the invoices in question. RCC asserts that the checks provided have been credited and applied, and that JP Rail's outstanding balance overall is actually in excess of the $1,013,673.51 sought in this action. This difference is represented as between Exhibits 21A and 21B of the Final Pretrial Order and indicates an outstanding amount owed in excess of $1.7 million as between RCC invoices and JP Rail checks. As such, RCC argues that it is entitled to summary judgment in the amount it seeks, plus interest and costs.

JP Rail counters that since its production of the checks on April 23, 2010, RCC has made no effort to account for the bills or invoices to which the checks were applied. Plaintiff, JP Rail contends, bears the burden of proof, but has not offered evidence as to

12

how RCC credited the unallocated checks, save for Mr. Daloisio's "unsubstantiated and undocumented" assertion that checks which did not indicate a designation were applied to the oldest outstanding invoice. (Def.'s Opp. Br. [86] at 12.) JP Rail also points to the December 1, 2007 letter, sent by RCC, which indicated that an audit of RCC's account showed a current amount due as of October 31, 2007 of $60,978.40. This amount matches the "amount due" listed on the Customer History Report which RCC submitted as Exhibit 21C to the Final Pretrial Order. JP Rail argues that summary judgment in favor of RCC is inappropriate on this record, given the inconsistencies in the amounts claimed due and RCC's bare assertion that the invoices in question have not been paid without evidence of how JP Rail's produced checks were credited. The Court agrees with both parties.

Plaintiff has not filed suit seeking an unpaid amount generally owed; rather, RCC seeks damages arising out of specific invoices that it contends are unpaid. As such, RCC bears the burden of proof in establishing that those particular invoices, contained in "Exhibit A" of Plaintiff's Complaint, have not been paid. To defend against such a claim, on grounds of payment having been made, JP Rail must demonstrate not merely that some money has been paid to Plaintiff, but that those same invoices have been paid. Due to the parties' practices with respect to payment and its receipt, neither party has yet met its respective burden.

JP Rail offers numerous checks, the majority of which do not indicate to which invoice they were to be applied; as such, some or all of these checks may have been intended for and applied to debts other than those at issue. It is therefore not enough to baldly assert that these checks ought to be applied to the invoices that RCC claims are

13

unpaid as they may have been used to satisfy obligations that are not in dispute. In short, Defendant has not presented evidence that it paid the invoices specified in the Complaint.

RCC, however, does not dispute the receipt of payments from JP Rail and describes a process in which unspecified payments were credited to the oldest outstanding invoices. Yet, RCC has not provided records that fully indicate to which invoices JP Rail's checks, upon receipt and after being cashed, were applied.[3] Thus, while RCC may demonstrate that a general, unpaid amount of money exists as between the parties, as demonstrated by Exhibits 21A and 21B, RCC has not demonstrated that the unpaid amount arises out of the *specific invoices* it claims are unpaid. As such, just as JP Rail cannot simply rest on its assertion that the checks provided were or ought to be applied to these invoices, RCC cannot simply rest on its assertion that the difference between the amounts billed and amounts paid reflected in Exhibits 21A and 21B shows that *these* invoices—as opposed to some others—went unpaid. Similar to the situation regarding JP Rail's unallocated checks, in which some or all of the checks may have satisfied other debts, RCC's recognition of a difference as between all amounts ever paid and all amounts ever billed may well reflect amounts that arise from other invoices which are outside of the statute of limitations and therefore unrecoverable.

As stated above, Plaintiff claims damages based on particular—not generalized—unpaid sums. These sums are alleged to  relate to particular invoices for

---

[3] The Court's cursory review of the schedule of checks submitted by JP Rail on April 23, 2010 revealed that not all of the checks produced on that date are listed on the Customer History Report submitted as Exhibit 21C to the Final Pretrial Order.

work RCC completed. To succeed on its claim, Plaintiff bears the burden of showing that the invoices cited in and attached to its Complaint were not paid; it is not enough simply to demonstrate that some amount is due without connecting that amount to the particularized debts which ground the cause of action. Defendant, on the other hand, claims that the amounts reflected in the invoices has been paid. It is not enough for Plaintiff to say that a reasonable jury could not find that Defendant paid certain debts based on the record as it stands when the same reasonable jury also could not find that those debts were due and recoverable. The parties in this case simply point one to the other, declaring that it is the other who bears the burden of divining from this murky and muddled morass of accounting the facts as to which debts this non-distinctive assemblage of payments applied. If the parties are unable or unwilling to make this determination of disputed fact, then certainly the Court cannot do so on summary judgment. Viewing the facts in the light most favorable to Defendant, the Court finds that a genuine issue of material fact exists as to whether or not the specified invoices were paid and any amount that may be due. Accordingly, Plaintiff's motion for summary judgment will be denied.

## IV. The Parties' Motions for Summary Judgment as to the Oldman's Creek Bridge Project

Both parties move for summary judgment on Plaintiff's claims arising out of the Oldman's Creek Bridge project. JP Rail argues that it did not have a contract with RCC for the replacement of the trestle and that RCC did not complete the work; rather, the project was taken over by Salem County, which accepted bids on the project and awarded the job to another company. JP further argues that as a matter of law, RCC

15

cannot succeed on a lost profits theory and is not entitled to the damages it seeks. RCC, in its cross-motion/opposition [88] seeks damages related to its initial expenditures in preparing to do the job as well as profits and overhead lost as a result of not being awarded the project. According to RCC, JP Rail told RCC that it had the job, but later awarded the project to another contractor. Because the Court finds that a genuine issue of material fact is in dispute between the parties with respect to this project, both motions will be denied.

The parties do not dispute that RCC did not complete the trestle replacement for the Oldman's Creek Bridge. There is also no dispute that Mr. Collard indicated in some form that RCC would replace the trestle. (Collard Aff. ¶ 10; Daloisio Dep. 185:21-22.) The parties do dispute, however, the nature and effect of the communications between them regarding the project; i.e. the parties dispute whether there was a contract and, if so, whether JP Rail breached it. JP Rail contends that RCC had performed repair work on the bridge and it was subsequently discovered that more work was required. (Collard Aff. ¶ 10.) Mr. Collard asserts that he informed RCC that he "would issue a Change Order" to include replacement of the trestle. (Id.) After RCC's engineering and preparation of dapping plans, however, and before any other work was performed, Salem County, which owns the Salem branch, took over management of the project. (Id.) According to Mr. Collard, it was Salem County, not JP Rail, who put out requests for bids and awarded the project to a bidder other than RCC. (Id.)

RCC disputes this sequence of events. According to RCC, Mr. Collard did not say that RCC "would get" the job to replace the trestle, but that "Mr. Collard said the job was [RCC's]." (Dep. of James J. Daloisio, 188:21-22.) RCC contends that Mr. Collard wanted

measurements and calculations for the project, as well as dapping plans, which RCC performed, and obtained from a third party, respectively. (Id. at 185:23-25; 186:1-17.) According to RCC, JP Rail–not Salem County--then awarded the job to another contractor based on a lower rate. (Id. at 187:4-7; Pl.'s Cross-Motion Br. [88] at 32.) RCC argues that JP Rail therefore breached the contract and that RCC is entitled to damages including lost profits and reimbursement of out-of-pocket costs.

The Court does not weigh the evidence or make credibility determinations on a motion for summary judgment. As such, whether JP Rail granted RCC the contract for the replacement of the bridge, as well as the issue as to whether it was Salem County or JP Rail who awarded the contract to another contractor, are issues to be resolved by the trier of fact. The evidence in the record with respect to the latter issue in particular is not complete enough to enable a determination with respect to how or why RCC was not contracted to perform the trestle replacement. Accordingly, JP Rail's motion for summary judgment with respect to the Oldman's Creek Bridge project and RCC's Cross-Motion for summary judgment regarding same will be denied.

## V. RCC's Motion to Strike

Finally, Plaintiff filed a separate motion to strike, seeking an order striking Defendant's Answer and entering default judgment in favor of RCC. This motion will also be denied.

RCC argues that JP Rail has failed to respond to certain of its discovery requests and discovery orders issued by the Court relating to JP Rail's asserted defense that the invoices in question have been paid. Specifically, RCC points to Orders issued on May 19, 2009 and April 14, 2010 (Docket Entries 27 and 37, respectively), ordering

17

Defendant to produce documents responsive to certain of Plaintiff's discovery requests, as well as an Order issued on August 2, 2011 (Docket Entry # 81), under which the required date of compliance had not yet passed by the time RCC filed its motion to strike.

In its moving papers, RCC essentially argues that documents produced by JP Rail, namely canceled checks, bank and other financial records, were untimely and are at best incomplete and not responsive. Specifically, RCC focuses on JP Rail's obligation to produce documentation evidencing payment of the invoices listed in Exhibit A of plaintiff's complaint. The seventy checks which JP Rail produced on April 23, 2010 fail to satisfy this request, RCC argues, because the checks do not indicate that they applied to the Exhibit A invoices. Rather, these checks were selected by Defendant's counsel from among documents not turned over to RCC. RCC asserts, on more than one occasion, that the only logical explanation for JP Rail's failure to turn over such documents is that no such documents exist; yet, at the same time, RCC accuses JP Rail of withholding such documents in bad faith and in willful disregard of the Court's discovery orders. According to RCC, under the six-factor analysis of <u>Poulis v. State Farm Fire and Cas. Co.</u>, the striking of JP Rail's Answer and entry of default judgment in favor of RCC is "required." The Court does not agree.

Given the state of the record in this case and the poor accounting practices as between the parties, Plaintiff's counsel's frustration with the pace and nature of the production of documents is understandable. As noted above, the record remains insufficient to determine all of the issues presented in this case. Plaintiff's bald accusations of "a designed strategy to not produce any documentation despite its

18

obligations and the Orders entered by the Court" (Pl.'s Reply Br. [94] at 26), however, as well as its allegations of deception, are made too casually and rest largely on Plaintiff's counsel's speculation and skepticism.

Our courts have affirmed that the sanction of default is "drastic" and "extreme." Poulis, 747 F.2d 863, 868 (3d Cir. 1984). Despite RCC's broad assertions, Defendant and its counsel have actively participated in this litigation, including complying with and participating in discovery beyond the production requests that RCC states have gone unsatisfied. Both the parties and the Court have expended considerable resources over the prolonged course of this litigation, and even assuming that Defendant's production of checks and records leaves much to be desired, its conduct is not so egregious as to justify such an extreme sanction as entering default judgment and foregoing resolution of this case on the merits. As such, Plaintiff's motion to strike will be denied.

## Conclusion

For the reasons discussed above, Defendant's Motion for Partial Summary Judgment will be GRANTED IN PART and DENIED IN PART. Plaintiff's Motion for Summary Judgment, Cross-Motion for Summary Judgment, and Motion to Strike will be DENIED. The appropriate orders shall issue.

Dated: March 19, 2012

                                          ___/s/Joseph H. Rodriguez_____
                                          Hon. Joseph H. Rodriguez,
                                          United States District Judge